EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN MARI RAMOS y ROBERTO SANTANA, acusados y apelantes. EL MISMO, demandante y apelado, *v.* JUAN MARI RAMOS, acusado y apelante. (DOS CASOS) EL MISMO, demandante y apelado, *v.* JUAN MARI RAMOS y RAFAEL PADILLA, acusados y apelantes.

Números 15655 al 15658.

*Sometidos:* 3 de diciembre de 1954. *Resueltos:* 11 de diciembre de 1956.

*Amador Ramírez Silva,* abogado de los apelantes; *Hon. Secretario de Justicia Interino J. B. Fernández Badillo y Rafael L. Ydrach Yordán, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

*Per Curiam:* Juan Mari Ramos fué acusado por el Fiscal del Tribunal Superior de Puerto Rico, Sala de Mayagüez, de 4 infracciones(1) al art. 1 de la Ley núm. 24 de 20 de abril de 1928—24 L.P.R.A., sec. 821(2)—consistentes en tener en venta café adulterado con cáscara del mismo grano

---

(1) En dos de dichas causas son también apelantes los coacusados Roberto Santana y Rafael Padilla. Santana fué sentenciado a pagar una multa de $25 en su caso y Padilla de $50 en el suyo.

(2) Dicho artículo dispone:

"Será ilegal adulterar o mezclar café, en grano, triturado o molido, con cualquier otro grano o sustancia, con la intención de venderlo, ofrecerlo o tenerlo en venta, y será igualmente ilegal que dicho café, así adul-

(en 12.4%; 6%; 7% y 7.6%, respectivamente) con el fin de dedicarlo al consumo humano. Vistas las causas ante dicho tribunal, fué el acusado convicto en cada una de ellas y sentenciado a pagar una multa de $50 en cada caso, o, en su defecto, a sufrir un día de cárcel por cada dólar que dejare de satisfacer, más las costas.

En apelación, además de interponer contra las acusaciones la excepción perentoria de falta de hechos constitutivos de delito, sostiene que el tribunal sentenciador cometió error (1) al declararle culpable, en contravención a lo resuelto en *Pueblo* v. *Frau*, 52 D.P.R. 782; (2) al admitir en el juicio la transcripción del testimonio presentado en el caso de *Frau* por el perito Del Valle Sárraga y (3) al apreciar la prueba.

En cuanto a la excepción perentoria, su argumento es al efecto de que, como en las acusaciones se alega adulteración con cáscara *del mismo grano*, y no con otro grano, no existe delito porque la cáscara no es *otra substancia* (modalidad bajo la cual hay que determinar la suficiencia de las acusaciones) sino *parte del fruto* del cafeto.

No tiene razón. La cáscara, aunque forma parte del fruto, no forma parte del grano en sí, y en ese sentido resulta una substancia extraña al grano mismo, que es lo que se ofrece, terminado el proceso de torrefacción, al expendio público como café molido, para sacar de ahí la tinta que se destina al consumo humano. El adulterante puede constituirlo, conforme a la ley, un grano distinto al grano del café, como puede constituirlo, entre otras substancias, la cáscara que envuelve los dos granos que contiene la fruta, y la cual, en el proceso de torrefacción se separa del grano y se desecha por no ser propia para el consumo del hombre.

Los errores señalados no requieren examen por separado. La cuestión principal aquí envuelta es si debe prevalecer, al

terado o mezclado, sea vendido, ofrecido o tenido en venta, o sea transportado o almacenado con el fin de dedicarlo al consumo humano, o sea usado para fines industriales, cuando se destine a la preparación de alimentos para el consumo humano."

decidir estos casos, el criterio expuesto por este Tribunal en el de *Pueblo* v. *Frau,* supra. Resolvemos en la negativa. En dicho caso se imputó a Frau una adulteración de café con cáscara del mismo grano, que el perito Del Valle Sárraga, del Fiscal, calificó de "pequeña adulteración" porque venía siendo "algo así como un 7 por ciento de cáscara con respecto a la totalidad del café." Dicho perito declaró que el 12 por ciento de fibra cruda se considera como *standard* en un café normal. Y se expresó así:

"En este caso los datos están en el *border line* entre lo que constituye una contaminación accidental y una adición intencionalmente. Más bien está en la zona de la adulteración intencional, *sin que con esto el perito quiera decir que ese haya sido el caso.* Lo que quiero decir con ello es que si ha sido una contaminación indudablemente que ha habido negligencia o descuido notable o quizás algún defecto muy serio en el procedimiento mismo que ha dado lugar a que esta fibra haya estado en cantidad . . . ." (Bastardillas nuestras.)

Fundándose en que el perito, al ser preguntado si como resultado del análisis podía decir que en dicho caso había habido "una adulteración activa o intencional", contestó que no podía asegurarlo, este Tribunal llegó a la conclusión de que la prueba era insuficiente para que el juzgador quedara convencido, fuera de toda duda razonable, de la culpabilidad del acusado, y revocó la sentencia condenatoria.

El aquí apelante invoca la autoridad de dicho caso para sostener la improcedencia de las convicciones señalando que en todas menos una de las causas seguidas en su contra la adulteración imputádale fué de alrededor de 7 por ciento, sustancialmente igual que la imputada en el caso de *Frau.*

No estamos de acuerdo. Aquí quedó definitivamente establecido por la prueba de El Pueblo que las muestras de café procedentes de la torrefacción del apelante contenían *cáscara,* determinación ésta que se hizo en virtud de una prueba *cualitativa* de examen en microscopio para identificar la estructura del sedimento obtenido a través del procedi-

miento usual, descrito por el perito Gadea Picó. Comprobada la existencia de *cáscara*, se procedió a hacer una prueba *cuantitativa* para determinar la cantidad de dicho adulterante. Para ello se hizo una determinación del por ciento de *fibra cruda* presente, ya que, según el testimonio pericial, el máximo de fibra cruda en el grano del café de Puerto Rico no llega a 14 por ciento, siendo el exceso sobre esta cantidad de fibra cruda el factor utilizado para determinar el por ciento de cáscara presente, por cuanto la fibra cruda se encuentra en la cáscara del grano en un 65 por ciento.

El art. 1 de la ley que se alegó infringida castiga no sólo a quienes adulteran o mezclan café en grano, triturado o molido, con cualquier otro grano o substancia, con la intención de venderlo, sí que también a cualquier persona que venda, ofrezca o tenga en venta, o transporte o almacene, con el fin de dedicarlo al consumo humano, café así adulterado. En cuanto a esta última modalidad la ley no requiere que las personas que lo ofrezcan, tengan en venta, o lo transporten o almacenen con el fin de dedicarlo al consumo humano, lo hayan adulterado. Lo esencial es que el café esté adulterado y se venda, ofrezca o tenga en venta para el consumo humano. *Pueblo* v. *Beauchamp*, 40 D.P.R. 206. El propósito del estatuto, de proteger la salud del público, así lo requiere.

En el caso de autos se imputó al aquí apelante *tener en venta* café adulterado. El hecho de que él fuera un torrefactor de café y que fuera en su torrefacción donde se molió y empaquetó el mismo, no le pone en mejor situación que a cualquier otro acusado que tuviera u ofreciera café adulterado.

Tampoco consideramos erróneas las sentencias dictadas por el hecho de que la Administración de Suministros vendiera al acusado café importado y que en una ocasión, 7 de abril de 1953, le cursara un telegrama indicándole que el café mejicano debería ser limpiado de paja y otras materias

antes de "tirarlo" al mercado. De las cuatro infracciones imputadas al apelante, dos fueron en los meses de agosto y octubre de 1952 y dos en el mes de enero de 1953, o sea, varios meses antes de la notificación de la Administración de Suministros sobre el café mejicano. La prueba del propio acusado demuestra que él compraba un promedio de 100 quintales semanales de dicho café, aparte de que según surge de su propia prueba la advertencia de la Administración de Suministros se refería a una partida específica de café mejicano que contenía una gran cantidad de "paja o pergamino", lo cual, según la composición del café, no incluye la cáscara en sí.

Las manifestaciones de los peritos de El Pueblo en el sentido de que el café collor contenía hasta un 18 por ciento de fibra cruda no afecta el resultado de este caso, ya que, según hemos visto, la presencia de cáscara como adulterante fué comprobada cualitativamente.

Siendo suficiente la prueba en autos para sostener las convicciones y no encontrando que el tribunal a quo incurriera en ninguno de los errores señalados, *las sentencias serán confirmadas.*